COHEN et al. v. AMERICAN CREDIT INDEMNITY CO.

(Supreme Court, Appellate Term. November 30, 1909.)

1. INSURANCE (§ 665*)—CREDIT INSURANCE—PROVISIONS IN POLICY—TERMINA-
TION—EVIDENCE.

In an action on a credit insurance policy, which provided that the bond:
would be terminated upon the discontinuance of the business by the par-
ties indemnified, evidence *held* to show that plaintiffs had discontinued.
their business.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 665.*]

2. TRIAL (§ 139*)—SCINTILLA OF PROOF—DISMISSAL OF COMPLAINT—DIRECTION
OF VERDICT.

Where the testimony presents barely a scintilla of proof in favor of the-
plaintiffs, the trial judge should dismiss the complaint or direct a verdict.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341;.
Dec. Dig. § 139.*]

Appeal from City Court of New York, Trial Term.

Action by Morris Cohen and another against the American Credit
Indemnity Company. Judgment for plaintiffs, and defendant appeals..
Reversed, and new trial ordered.

Argued before GILDERSLEEVE, P. J., and SEABURY and
LEHMAN, JJ.

Hirsch, Scheuerman & Limburg (Henry L. Scheuerman and Her-
bert R. Limburg, of counsel), for appellant.

House, Grossman & Vorhaus (Louis J. Vorhaus and Joseph Fischer,
of counsel), for respondents.

LEHMAN, J. The plaintiffs are merchants formerly doing business
under the firm name of M. Cohen & Co. On June 8, 1904, they ob-
tained from the defendant a policy of credit insurance to expire on the
6th day of August, 1905. The plaintiffs previous to that date sold
goods on credit to the firm of Goldsmith Bros., who were adjudicated
bankrupts on July 6 or 7, 1905. The principal issue litigated at the
trial was whether on July 6th the policy was still in force or had ter-
minated prior thereto by virtue of the following clause contained in
the policy:

"If, during the term of this bond, the indemnified shall become insolvent, or
for any reason shall discontinue his business, or fail to carry on the same in
the usual course, or being a partnership shall be dissolved except by the ad-
mission or withdrawal of a member, then this bond shall terminate as if by.
express limitation, and an adjustment shall be made with the indemnified in-
the same manner as it would have been made if the bond had originally by
its terms been made to terminate at said date. Temporary interruption by
fire, or by strike, or the death, or withdrawal of or admission of a member of
a partnership, shall not be considered a discontinuance."

On the 26th day of June, 1905, the plaintiffs' lofts were destroyed'
by fire. The plaintiffs claim that this constituted only a temporary
interruption, while the defendant claims that it constituted a discon-
tinuance of the business: The defendant does not dispute that the
question presented is one of fact which the trial justice was bound to-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

present to the jury if there is any conflict of testimony as to the surrounding circumstances, or if the testimony is open to a reasonable inference that the, fire did, in fact, constitute only a temporary interruption, but, if the evidence is clear that either the plaintiffs have never subsequently engaged in the business in which they had been engaged prior to the fire or by their acts they had shown that they regarded the fire as a complete termination of their business and elected to discontinue it, then the trial justice should have either dismissed the complaint or directed a verdict for the defendant.

It appears from the plaintiffs' own testimony that the fire completely destroyed their lofts, and burned all their samples and patterns. After the fire, they immediately began to look for other suitable quarters, and employed a broker to find a place to carry on the business. They even asked one of their competitors for space, but this was refused. They had started to make samples in April, and had the samples complete about June 15th. It was useless to attempt under these circumstances to prepare new samples for that fall, and they did not make the attempt. All their principal employés left them, and they would have been obliged to organize a new staff. They therefore took temporary quarters at 853 Broadway, leasing room No. 20 in that building for one month at the rate of $25. At the expiration of the month, they gave up this room, but received desk room without charge from the firm of Peterson, Harlib & Co. This firm was composed of former employés; Peterson being a brother of the plaintiff Morrissey. For over a year from that time, they did no business except to collect their outstanding accounts. Operations in real estate was their only occupation, and these operations were conducted jointly. In November, 1908, almost a year and a half after the fire, they bought out the firm of I. Louis & Son at 139 Fifth avenue. This firm was engaged in the same line of business as the plaintiffs had formerly been engaged in. One of the partners of this firm, a man named Matthews, joined the plaintiffs' firm, and the new firm of Cohen, Morrissey & Matthews began business about January 1, 1906, in the premises that had been occupied by I. Louis & Son.

I believe that this statement of fact embodies the entire testimony of the plaintiffs that could in any way support their contention that the fire constituted but a temporary interruption of the business. If they are telling the truth, they are giving a reasonable explanation of their failure to resume business immediately, but their inability to secure any business in the fall does not explain why they did not make any attempt to secure trade in the following spring or the following fall. I do not believe that 12 men could possibly give this evidence any consideration, and then decide that an interruption lasting a year and a half and terminated by the resumption of business only after the purchase of the business of another firm with a new staff and a new partner could constitute a "temporary interruption."

The defendant did not rely solely upon the plaintiffs' failure to resume business in order to maintain its contention. It also introduced copies of circulars that had been sent out about July 1, 1905, which read as follows:

"Temporary Office of M. Cohen & Co., 853 Broadway, Room 20, New York.
"[Received September 21, 1905.]

"July 1, 1905.

"Dear Sirs: It is with great sorrow we notify you of the complete destruction of our plant by fire on the night of June 26th. It is a great loss to us, and being too late in the season to find satisfactory new quarters and organize a new business, procure merchandise, and make new sample lines, we have decided to retire from the cloak business. We feel that we have made many friends during our 26 years' business career, and it is with feeling of profound regret that we retire therefrom. We thank you for your patronage in the past, and hope that you will always remember us as having tried to do the best we could for our mutual interests.

"Yours very truly,        M. Cohen.
                          "J. Morrissey.

"Our former representatives, Mr. Max Lachman and Mr. Henry Peterson will notify you of any connection which they may make. We sincerely hope that you will favor them with your confidence and patronage as heretofore.

"M. Cohen & Co."

"H. Peterson.        I. Harlib.        H. Kaufman.

"Peterson, Harlib & Co., Successors to M. Cohen & Co., Makers of Cloaks and Suits, 34 East 14th Street, New York.

"[Received September 21, 1905.]

"July 1, 1905.

"Dear Sirs: We take pleasure in informing you that we have decided to go in business as successors of M. Cohen & Co. We will manufacture the same class of garments which have always proved satisfactory to the trade. Our line will be ready by August 1st. The old firm stands right with us, and we shall receive all the assistance we need. Trusting to receive your kind patronage, and thanking you for past favors, we remain, very truly yours."

If these circulars were sent out with the plaintiffs' consent, then the plaintiffs have affirmatively discontinued their business. The plaintiffs, however, explain that they never authorized these circulars, and knew nothing about them until a few days after July 1st, when they began to receive letters of regret from their former customers. It is extremely significant that on July 1st they were actually occupying room 20 at 853 Broadway, and that, in spite of the alleged duplicity of Mr. Peterson, they never upbraided him and continued to have friendly feeling towards him and made their office with him. Conceding that their story is true, these circulars still remain valuable testimony of their actual intention to discontinue their business because they state that they did not contradict these circulars because "it was not necessary. We were not in business. We could not get business quarters to resume business"—and, when these circulars are fortified by the testimony of a reporter from Bradstreet's Credit Agency showing that about July 5th Morrissey stated that they intended to give up business, I think no reasonable person could doubt that these plaintiffs did at that time actually discontinue their business.

Since the testimony presents barely a scintilla of proof in favor of the plaintiffs, the trial justice should properly have dismissed the complaint or directed a verdict.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event. All concur.